May it please the court I would like to reserve three minutes for rebuttal. My name is Doug Janney I'm here on behalf of the appellant James Pearson. Mr. Pearson respectfully requests that the court reverse the grant of summary judgment of the district court based on the aggregation of genuine issues of material fact in this case as to whether the defendant eliminated Mr. Pearson's job position or whether it discharged him because of his age. We have several points regarding genuine issues of material fact we'd like to make. First QG offered contradictory testimony on whether corporate resources from Wisconsin assumed part of Mr. Pearson's job duties or whether David DePriest a substantially younger 15-year younger employee assumed all of those duties himself. Mr. Muehlbach the 30b6 representative in this case testified at one point that a quote a number of people replaced Mr. Pearson at the beginning but then he goes on to say that only Mr. DePriest had replaced Pearson and the reason for that is because they want to say a number of people replaced him to avoid a finding that of replacement but they want to say that only DePriest I actually want to say a number of people replaced him to avoid a finding that Mr. DePriest was not qualified and that's a big issue in this case. We contend that Mr. Pearson was substantially objectively far more qualified for retention in the job position at issue than was Mr. DePriest. You know can an employer avoid liability by who may be engaging in invidious discrimination by not replacing the employee discriminated against with a single replacement as an artifice to avoid liability. Let's say individual is the victim of age discrimination and the employer contends that there's no case there the legal requirement of being replaced by a legal by a single employer is not satisfied if the employer deliberately divides the discriminated against employees responsibilities among a number of people just for the purpose of avoiding liability. The case law seems to say that the person has to be replaced by a single person or you don't have a case. What's your take on all that? I think that's going too far because an employer all they have to do is say that and then you get this higher burden of discrimination or evidence of plainly superior qualifications that that would overcome that even if the employer does say in this case we they say on the one hand that one person replaced him and on the other that several people replaced him so that right there is a genuine issue of material fact. We're supposed to take all the facts in the light most favorable to your client right? Absolutely your honor. Viewing all of these issues and facts in the light most favorable to Mr. Pearson this case should be reversed and remanded for a Mr. DePriest the younger individual that his job fundamentally changed when he when he moved from Nashville Tennessee to rural Dixon Tennessee and began doing Mr. Pearson's plant facilities manager job. He maintained the same hours work undisputed that he maintained the same work hours that he had before. His previous travel schedule was greatly reduced that's what QG testified. He assumed a number of direct reports that he'd never had before and this all makes sense if he's taking over the job duties of your client. So I'm not sure what your point is that that he's taking over the duties but he's replacing Mr. Pearson by because it was a plant facilities manager job was a full-time job and Mr. Pearson testified that he had an enormous workload and so for this other full-time employee to physically move to the plant and be in that plant doing that job suggests viewing the facts in the light most favorable to the plaintiff that he replaced him. Now even if he didn't there's evidence that Mr. Pearson should have been considered for that job because that's the primary job at issue here the plant facilities manager job that's what David DePriest became. So you're contending that because of the time constraints and the demands of the job that the employers contention that DePriest did not replace your client is not credible that the requirements were such that he would have had to have done that. That's certainly a part of it that won his travel and the things he was doing before traveling extensively that all stopped and then he came to Dixon and was doing Mr. Pearson's job which was a full-time very demanding plant management job so that's part of it. We also contend that Mr. Pearson's job was not eliminated. That's the legitimate non-discriminatory reason asserted in this case is that the plant facilities manager job was eliminated and that's just not the case. That same summer, the summer of 2011, QG invested three million dollars to upgrade its printing presses at that plant and Mr. Muehlbach, the corporate representative, testified that if you're going to maintain it, keep it. You cut the number of people working there into about a third, didn't you? They did after 2012, your honor. They did not in 2011. In 2011, with the time, you know, they took less than a day to eliminate Mr. Pearson. Let me ask you this. There seems to be a dispute of fact about whether they cut him because he was not a quote team player and I know there's a company says no they didn't have anything to do with it, that it was done in the headquarters, but on the other hand, there is a good bit of testimony that that was the real reason. Lentz didn't like him. Was there any further evidence deduced or about why they thought he was not a team player? It just seems to be a conclusion that is stated, but is there any basis in the record there? Your honor, I think that was a major point that we raised in the district court. Carl Lentz, the 33-year-old supervisor, testified that he went and told Sandra Snyder, the HR manager at the Dixon plant, that he was coming to Dixon from Oklahoma City, where he worked, coming to Dixon to discharge Mr. Pearson because he was, at least in part, because he was not a team player. Other evidence is Ms. Snyder's one page of handwritten notes of her phone conversation with Mr. Lentz. She even wrote the words in quote team player. And so viewing the facts and evidence in the light most favorable to the plaintiff and drawing all reasonable inferences from that evidence, that's a reason that they asserted. And then when this litigation began, they contracted their reasons and that reason was dropped from the litigation and they insist that team player and performance had nothing to do with it. Do you have any background from why Lentz drew the conclusion that he was not a team player? It was just dropped? It was dropped, your honor, and QG's corporate representative testified in this case and they maintained in interrogatory responses that it was just an elimination, that his performance had nothing to do with it. But you've got Lentz saying the team player reason. You also have, there's an October 10, 2011 memorandum in the record, authored by an HR person, that says that the decision was based on performance, not age. This was after Mr. Pearson had submitted an email saying he thought his discharge was, he had concerns it was related to age. The memorandum said it was related to performance, not age, and then QG maintains in this litigation. You don't contest the fact that that was a reduction in force, right? That they were going through, I guess, some hard times or something and they reduced the force for the whole company by a substantial margin. So it is accurate to say they were engaged in a reduction in force, right? Respectfully, your honor, here's our position on that. They engaged in a reduction in force in 2012 and later, but not at the time of the adverse employment decision. At the time that Mr. Pearson was discharged, there was no time. That's another thing. Judge Moore's opinion in Blair v. Henry Filters discusses that if an employer doesn't have a blueprint or an objective plan for a reduction in force, say like a RIF policy that's reviewed by a labor law attorney and you've got this objective plan in place to eliminate job positions, that that's evidence of pretext. Here, Joel Muehlbach in Wisconsin learned on August 18, 2011 that he was expected to review every position in the company and say what positions could be eliminated. The very next day, August 19, 2011, Carl Lentz decides to discharge Mr. Pearson allegedly because he was not a team player and tells Muehlbach and Muehlbach approves that decision and then Pearson's gone. Would you say that there's a dispute of fact about whether there was a RIF at this time? Did Pearson receive compensation upon termination? He did not receive compensation upon termination. Zero? He did not receive compensation, no. Separation pay or nothing? There was a small offer, but he firmly believed that his discharge was because of age and did not accept that and made a complaint to the employer of age discrimination. They never interviewed Muehlbach, DePriest, or Lentz about Mr. Pearson's concerns. Why is there this discrepancy as to whether Mr. Pearson was discharged by Mr. Lentz or by Mr. Muehlbach? It's unclear which one of those actually discharged your client. You're absolutely correct, Your Honor. In addition to differing reasons, there's conflicting testimony about who was principally responsible for this discharge decision. If you read Carl Lentz's testimony, he says that he made the decision and that Muehlbach merely approved it. If you read Muehlbach's testimony, Muehlbach says Muehlbach made the decision. So you've got conflicting testimony about who was primarily responsible for the discharge issue. You've got contracted reasons for the issue. And another thing that's really important, Your Honors, is that this defendant, they're a big 23,000 employee company.  They know how to conduct a RIF. And how do we know they know how to conduct a RIF? Because after the decision to discharge Mr. Pearson was made, they manufactured documents falsely purporting to compare Mr. Pearson and Mr. DePriest for a reduction. And they admitted that they did no such thing. They did this. They went to great lengths to make it appear. What do you mean when you say they manufactured documents? There are two sets of documents, Your Honor. There are these documents called Criteria for Selection Forms that Carl Lentz went back after the decision had already been made purporting to rate Mr. Pearson and Mr. DePriest. And Lentz wasn't even qualified to fill out those forms because he didn't even supervise David DePriest. But they created these Criteria for Selection Forms, filled them in after the decision had been made, and admittedly without ever actually considering David DePriest for reduction. Now, Lentz testified those were the two people who we were considering for reduction. But QG says we never actually considered DePriest for reduction at all. And they gave Mr. Pearson, when they discharged him, a chart with information on him and DePriest's age, falsely purporting to compare those two based on qualifications, job duties, and business need. And then they admit in litigation that didn't happen. They went to great lengths to make it appear that they had conducted a RIF at the time that they discharged Mr. Pearson when they did no such thing. Was this a post-dated, was the date changed on this form, or was it dated at the time that the form was completed? Your Honor, it was dated after the decision was made on August. It was dated after the decision, but I'm asking whether they put the proper date on the form. I believe that they did. I mean, it's a different thing to manufacture evidence than to write a form after the fact that actually does compare two people. As long as they're being honest that, oh, yeah, after the decision was made, we did up this form, and it shows that one is, in their view, better than the other. They did up the two forms, Your Honor, and I can't say that they put a false date on there, but the date of the forms that they're signed and filled out is definitely after the decision was made. And so it begs the question, why fill out these forms that, on their face, purport to compare these two individuals when they admit in their deposition testimony that they did not compare, that DePriest was never even considered for elimination? They didn't make a... Your red light has been on for a while. Yes, please do. I know your time is out, so this is a very brief one. Just to clarify, when was the earliest date that you contend management people began to discuss whether Mr. Pearson's position could be eliminated or Mr. Pearson could be let go as an employee? That's one part of the question. The other part of the question is, what was the date that the RIF was designed or formulated as something the company would do? Your Honor, to answer your first question, the earliest date that they ever started talking about Mr. Pearson for discharge or elimination, whatever you want to call it, was August 18th or 19th, because Muehlbach didn't learn that he was expected to review every position in the company and make decisions until August 18th, and then on August 19th the decision was made to discharge Mr. Pearson. August 18th, 2011? Yes, in August. And when did the company decide to do this RIF? Well, they didn't decide to do this RIF until 2012, but they decided to fire Mr. Pearson on August 19th, 2011. Okay, thank you. Thank you. We'll let you have your rebuttal time. Thank you, Your Honor. May it please the Court, my name is Laura Linder and I represent the appellee QG, LLC in this matter. I think it's important to understand that this was really a two-phase decision. To address Judge Clay's point, this all started with an email from the CEO of the company on August 11th when he announced an initiative called Fortress Quad, which was an overarching cost-cutting initiative following a very big acquisition by Quad Graphics of world color. And following that was consolidation and the need to reduce operations. Subsequent to that email, Mr. Muhlbach's boss told him, you need to review the positions in your organization and decide if you can eliminate some of them. And what day was that? That was sometime after the 11th, we think around the 13th Mr. Muhlbach was traveling and then his father died so the dates were a little fuzzy for him. You mean after August 11th? August 11th was the email from the CEO. Correct. Okay, but this was not the rift at this time, this was just talk about getting rid of people? This was the cost-cutting initiative that led then to the decision to eliminate positions. So Mr. Muhlbach then... Okay, but do you mean eliminate positions just in general or specifically as a part of this rift that would formally be instituted? So Fortress Quad was a general cost-cutting initiative. What Mr. Muhlbach decided to do in his organization as part of cutting costs was to eliminate positions, so reduce labor costs through that. So Mr. Muhlbach decided I will cut costs... Okay, I got that. The only thing is that that's not the rift as of yet. Well, it was Mr. Pearson was eliminated in sort of the first wave of the reduction in forests. The reductions occurred over two years. You're not answering my question, though. When did the rift come into being? Well, Mr. Pearson was eliminated on August 23rd as part of a forest reduction. Himself and another... You're still not answering my question. What date did the rift get instituted on? The meeting that led to these decisions to identify people for layoff was on August 19th with Mr. Muhlbach. Of 2011? Correct. So your position is that the rift was instituted by management on August 19th, 2011, and that was the rift? That was the meeting where they discussed position eliminations. Wait a minute, wait a minute. I keep asking you if that was the rift, and instead of saying yes or no, you start talking about position elimination. So then I don't know if you're agreeing that that's the rift or not. Either it is or it isn't. And perhaps I'm misunderstanding your question. I apologize. There's a formal reduction in forest program that was instituted by the company at some point around somewhere in 2011 and 2012, right? Yes. And I keep asking you what that date was, and then instead of giving me the date, you start talking about reducing personnel. And I don't know if you're conceding that that's the date of the rift or there was some date of reducing personnel prior to the formal institution of this formal reduction in forest program. I can't get from you when did the rift get instituted. In this organization, it was August 18th or 19th. You're kind of saying they kind of eased into it. Right. There was phases of reductions. I mean, the one that Mr. Pearson was, as Mr. Muehlbach said, on the leading edge of this initiative. Maybe part of the quandary here is was there a formal rift program? And if so, like was there a document that said this is our rift program and wasn't that arguably from what your opponent is saying in 2012 as opposed to what happened in August of 2011, which seemed to be this more informal, hey, guys, we've got to reduce our force because we've got to cut costs, see what you can do, which is not a formal program at all, but just sort of like an aspirational thing. Right. There wasn't a formal program announced that says, for example, you have to cut 10% of your workforce. Was there ever such a formal announcement? Not on a corporate-wide basis. The corporate-wide initiative was cast-cutting, and then it was put down to the forces below saying you figure out how you're going to do that within your organization. So there never, not even in 2012, was a formal rift program saying you need to cut your employment by, hypothetically, I'm making this up, 10% of the workforce. Not in the record in this case. Counsel, the problem I have with this is it seems to be disputes of fact about why they got rid of the plaintiff here. Somebody said, and Lentz says and insists and tells everybody that he's not a team player, but Muehlbach, the fellow in the headquarters, says no, that doesn't have anything to do with it. And shouldn't, I guess he wants a jury trial here where we've got a dispute about why things happened. Shouldn't that go to the fact finder? I don't think so, Your Honor, and here's why. The decision to eliminate Mr. Pearson's job was made on Sunday, August 21st, and how that came about was this meeting occurred on the 19th. His position was identified as one that could be eliminated, as well as his counterpart at the Jonesboro plant. And Mr. Lentz sent an email to the HR manager saying we can eliminate these two positions, Mr. Pearson's in particular. The HR manager then went back to Muehlbach. Muehlbach said yes, and that was Sunday. The next decision was, okay, we're eliminating this job, but we still will have some facility management duties that need to be performed. Who's going to do them? And that was then Mr. Lentz's decision to decide, okay, and Mr. Muehlbach testified, I'm leaving that to Lentz to figure out who's going to cover these duties. And Mr. Lentz then decided, okay, I can use Mr. DePriest to do that. Mr. Lentz, prior to this whole announcement of cost cutting, had already tapped Mr. DePriest to assist with facilities management job duties at the Dixon plant. He had gotten feedback that certain projects were not being accomplished by Mr. Pearson, and so Mr. Lentz said I'm going to bring in Mr. DePriest and some other corporate resources. What I mean, Muehlbach is testifying that Lentz's view that this fellow was not a team player did not have anything to do, whatever, denied, had anything whatever to do with his discharge. Because Mr. Muehlbach. Yeah, well, that's fine, if that's what he thinks. But all the other evidence is that Lentz, who was in charge of getting a replacement and dealing with this plant, thought the guy was not a team player and didn't want to keep him around there. Now, all I'm saying is I don't know what the truth is, but that is an inconsistency. And I would think that Lentz's view that he's not a team player would leak over into the decision-making process if they're not stupid, you know. So there is a dispute of fact, it seems to me, about why he was discharged. And there's not a dispute of fact as to the decision on that point for this reason. First of all, Muehlbach identifies Pearson and his counterpart based on the fact that he knows Dixon and Jonesboro are being downsized so he doesn't need full-time facilities management. Lentz understands from the meeting, I've got to determine if I can eliminate positions in my organization and still meet my commitments. He says, I can get rid of Pearson. The notion of team player comes in because after they finalize this decision, HR then just goes to Lentz and says, well, you need to fill out these forms to sort of explain your selection decision. That's the company's theory, but there is evidence that would indicate they may not be forthcoming about all of the reasons here. That's all I'm saying. Well, and Lentz testified that, yes, he viewed Mr. Pearson as not a team player for a couple reasons. First of all, he said he got feedback from Bill Gray. Bill Gray ran press operations at Dixon. Now you're going to the merits of whether he is or isn't a team player. Well, there's support in the record for that view that's unrefuted and honestly held by Mr. Lentz. While Mr. Pearson might say, I was a team player, Mr. Lentz's perspective when he filled out the form was, I didn't feel that he was as much of a team player because of the fact that I got feedback from the press room guy. He also says, I brought DePriest over because before this whole RIF stuff started, I brought DePriest over to run some of these projects because they weren't getting done. And Pearson wasn't managing those projects. So the team player issue just gets introduced by virtue of these forms. But the testimony as to what was their thought process when they decide by Sunday the 19th who's going to go, that wasn't the decision. And the testimony is very critical on the team player point. You just said that they decided on August 19th who's going to go. But you said just a few minutes ago that it was August 21st that the decision was made to eliminate the plaintiff's job. Right, so on the 19th they had the meeting and said positions are going to be eliminated. And then on the 19th, Lentz sent the email to HR saying, we want to reduce Pearson and Hakenworth. And then on that Friday, the 19th, HR went to Muehlbach, and that Sunday he emailed back saying, yes, that's the decision. So the decision to get rid of the plaintiff here was made on August 19th by Lentz. Right, and finalized by Muehlbach through this email communication by the 21st, where Muehlbach writes back to Deas, yes, we want to terminate Mr. Pearson. And that's on a Sunday. And then it was after that these forms were given to Mr. Lentz to fill out. And Mr. Muehlbach didn't even know about those forms. And frankly, those forms, I disagree that it's manufacturing evidence because those forms didn't affect the decision. Again, the record's clear that that decision had already been made. The forms weren't used in any way in making the decision. Why were the forms created? For some reason, somebody in human resources thought they should have some forms that document this decision, and Mr. Lentz, from his point of view, was thinking, okay, I'm eliminating Mr. Pearson's job. I'm going to give those duties to Mr. DePriest, so these are the two folks I'm going to compare on the forms. And the important thing to remember, when it comes to qualifications, the issue isn't who's the most qualified facilities manager. I disagree that the position wasn't eliminated. The position is gone. You're down an employee. Mr. Pearson was gone. He was not replaced. The issue then was who can do these facilities management duties now that this position's been eliminated? Well, it's sort of, in going back to Judge Clay's initial questions of your opponent, it's a little bit confusing as to what the law and facts should be in terms of when there is downsizing. So thinking somewhat hypothetically, suppose that the company decides it needs to have one fewer person in the company because they just don't have enough money for X, and so they have X minus one. So what kind of situation is a legitimate RIF, and what kind of situation is one that is not in terms of people taking on the duties of the now-missing job position? In other words, going back to Judge Clay's question, should it make a difference that one current employee takes over all of the work of the now-missing employee, or should it be important that the work is spread around among existing employees? I don't think that matters, and I think the Court's decision in Barnes is instructive on that point. In Barnes, the Court said if you reduce one employee, that's a reduction. It doesn't need to be. It can be one. It can be 20. It can be 200. The fact of the matter here is Mr. Pearson's position was reduced, and the record shows others were reduced at the same time. Again, Mr. Hakenworth in Jonesboro, the same position, his position was eliminated at the same time. Within a day, they were announced, those terminations. I don't think it matters as to how many people replaced, whether it's one or both. I think what's important in this Court's case history is if you're replaced in whole, then the burden of proof is different. The fourth element becomes a heightened one, and you have to show additional evidence pointing you were singled out because of your age. Here, I think the evidence is undisputed that Mr. DePriest did not one-for-one replace Mr. Pearson. He retained his energy-related duties. He testified he did. Did he take over all of Pearson's duties? He took over whatever was left of those duties, yes. Whatever was left, meaning the management of the Dixon plant. And the Dixon plant was reduced. They went from five presses to three presses over time. Staff was reduced. But he did take over those facilities management responsibilities and retained his energy and energy-related duties. And that was critical to the analysis. Mr. DePriest, the testimony is clear. He was critical to that energy job because he knew of, like, there were over 300 utility contracts that World Color had had that he had intimate knowledge of. They were tied up in bankruptcy, and so they had to retain him, and he stayed on to do this work. The notion that he didn't travel is really irrelevant. Mr. DePriest said, I could do that work from anywhere. The fact that I was primarily in Dixon doesn't foreclose me doing energy work. That's done via computer, phone, and all sorts of things. Be careful in these cases because you can use this RIFT idea to do a lot of things you can't otherwise do under the law in terms of discrimination. And I think lawyers understand that. I certainly agree with you, Honor, but I don't think the evidence here, there's not enough circumstantial evidence here to suggest that age was the factor. Unlike this Court's other cases where you've reversed summary judgment decisions for employers, there is no evidence of any ageist remarks. There is no evidence of any statistical disparity. There's no circumstantial evidence suggesting age was a factor here. There was some very young person who was retained. Can you address that person? Yes. His name is Adam Dillard. He was in the Nashville facility, so in a much lower level position than Mr. Pearson. The Nashville facility was actually expanding. So unlike Dixon and Jonesboro, that facility was expanding. They didn't consider his position for elimination. I mean, Mr. Pearson points to him because he's younger, but they weren't necessarily even doing the same things. There was not a one-to-one comparison in regards to those positions. And he was in, like I said, a different facility that was expanding, and they weren't going to eliminate jobs there. Your red light is on also. Thank you. Go ahead. Your Honor, just a couple of quick points. Judge Moore just asked counsel whether David DePriest took over all of Mr. Pearson's duties, and counsel just stated that he did. But in the record, Quad Graphics is saying that corporate resources from Wisconsin, Kerry LaJuan, Jim Rago, and LaJuan, McCoy, and Rago came in and assumed and absorbed parts of Pearson's job. There's a dispute about that. There's a genuine issue of material fact as to whether that actually happened or not, Your Honor. And the reason that they're saying on the one hand that corporate resources did it is because they know that Mr. DePriest was not qualified to take over the full plant facility manager job and how do we know that? Because he had no printing experience in gravure printing. This is not an offset printing plant. This is a gravure printing plant, and Mr. DePriest had no experience in that, whereas Mr. Pearson had many years' experience in it. Does gravure printing mean only better margins? The margins are straight? Or what does it mean exactly? It means the presses are different, right? The presses are different, Your Honor. It's a different printing process, and it's a specialized printing process, and Mr. Pearson had years of experience in this specialized printing process. And Mr. DePriest admittedly not only had no experience in that, but had no solvent recovery experience. Those are the two major components of the Dixon plant facility manager job, gravure printing experience, solvent recovery, and environmental compliance. And those are the things that Mr. Pearson did. We're not talking about flip-flopping the roles where Pearson's trying to go do DePriest's job. It's DePriest coming in and doing the Dixon plant facility manager job. And the last point, Your Honor, is that... Their theory is that the plaintiff was not capable of doing this energy work that DePriest was capable of doing. Your Honor, Mr. Pearson testified that he did have some energy procurement experience, that he had helped with contracts for the Tennessee Valley Authority. That's in our brief, the site there. He testified that he did have some experience in this. And Mr. DePriest didn't have a whole lot of energy procurement experience. He admitted that he only began doing that in November 2009 when he came to QG and its predecessor company. That's the only experience he had. Mr. Pearson's position is that he could have done these minimal... which had become greatly minimalized. Mr. DePriest's duties at the Nashville plant had ceased. And Mr. Pearson contends that he could have done these other marginalized duties. The main job at issue was running the Dixon gravure printing plant. And QG did not make a reasonably informed and considered decision. There was no time to assess the job duties of these two men and their respective qualifications in less than one day. A jury could find that they did not make a reasonably informed and considered decision. And that's evidence of pretext. Thank you very much. Thank you both for your argument. The case will be submitted. Would the clerk call the next case?